## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JULIE DERMANSKY**                                **CIVIL ACTION**

**VERSUS**                                         **NO. 22-3491**

**HAYRIDE MEDIA, LLC**                             **SECTION: D (4)**

### ORDER AND REASONS

Before the Court is a Motion for Summary Judgment filed by the Defendant, Hayride Media, LLC,[1] and a Cross-Motion for Partial Summary Judgment and Other Relief Under Rule 56 filed by the Plaintiff, Julie Dermansky.[2]  Both Motions are opposed.[3]  The parties have also filed replies in support of their respective Motions.[4]  Defendant, with leave of Court, also filed a brief supplemental memorandum.[5]  The Cross-Motions for Summary Judgment are fully briefed.  After careful review of the parties' memoranda, the record, and the applicable law, the Court **DENIES** the Defendant's Motion for Summary Judgment and **GRANTS** the Plaintiff's Cross-Motion for Partial Summary Judgment.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This copyright infringement case concerns the unauthorized use of two photographs by a news and politics blog to accompany several articles.  Plaintiff Julie Dermansky ("Dermansky") is a professional photographer whose work mostly covers

---

[1] R. Doc. 30.
[2] R. Doc. 34.
[3] R. Doc. 35 (Plaintiff's Opposition); R. Doc. 54 (Defendant's Opposition).
[4] R. Doc. 47 (Plaintiff's Reply); R. Doc. 54 (Defendant's Reply).
[5] R. Doc. 56.

energy and environmental issues in Louisiana and the southern United States.[6]  To makes ends meet, Dermansky relies, in part, on revenue from licensing her work to others for publication pursuant to either written or oral licensing agreements.[7]  Her portfolio includes photographs of oil spills, oil and gas fields, refineries, protesters, and politicians.[8]  Defendant Hayride Media, LLC ("Hayride") operates an online news blog and website at thehayride.com offering "conservative political commentary . . . covering Louisiana and national politics and current affairs."[9]  Hayride is principally managed by Scott McKay ("McKay") out of his home office and relies on content authored either by McKay himself or by uncompensated guest bloggers.[10]

Dermansky alleges that Hayride used her May 1, 2014 photograph of former St. Tammany Councilman Jake Groby (the "Groby Photograph") and her August 18, 2016 photograph of Baton Rouge community activist and political candidate Gary Chambers (the "Chambers Photograph") on multiple occasions without her approval and without paying a licensing fee.[11]  Specifically, Dermansky alleges that Hayride used the Groby Photograph without authorization on at least two occasions and used the Chambers Photograph without authorization at least six times to accompany articles on Hayride's website.[12]  In no instance did Hayride give Dermansky credit for the photographs.[13]

---

[6] R. Doc. 34-1 at p. 7; R. Doc. 34-3, *Declaration of Julie Dermansky* ("*Dermansky Decl.*"), at ¶ 2.
[7] R. Doc. 34-1 at p. 8; R. Doc. 34-3, *Dermansky Decl.*, at ¶ 2.
[8] R. Doc. 34-3, *Dermansky Decl.*, at ¶ 2.
[9] R. Doc. 30-2, *Declaration of Scott McKay in Support of Hayride's Motion for Summary Judgment* ("*McKay Decl.*"), at ¶ 4.
[10] *Id.* at ¶¶ 5–6.
[11] R. Doc. 34-1 at pp. 7–14; R. Doc. 34-4 (Groby Photograph); R. Doc. 34-9 (Chambers Photograph).
[12] R. Doc. 34-1 at pp. 9–14.
[13] *See* R. Docs. 34-7, 34-12.

The Groby Photograph depicts then-St. Tammany Councilman Jake Groby speaking before a crowd of anti-fracking protestors demonstrating outside the St. Tammany Government Administrative Complex during a public council meeting concerning fracking.[14]  Dermansky alleges that she took approximately forty-one photographs of Groby at the event and ultimately chose the Groby Photograph for publication in connection with an article she wrote for Desmogblog.com entitled "Louisiana Residents Gear Up For Fracking Fight Just Outside New Orleans," first published on May 6, 2014.[15]  The DeSmog publication of the Groby Photograph included a photo credit reading "©2014 Julie Dermansky."[16]  Additionally, Dermansky gave permission to Truthout.org to republish the Groby Photograph with photo credit given to her.[17]

Plaintiff alleges, and Defendant does not dispute, that Hayride first used the Groby Photograph on July 23, 2015 to illustrate an article entitled "Anti-Fracking St. Tammany Councilman's Water Plant Has Tested Positive For Brain-Eating Ameba [sic]"[18] and again used the image in a July 27, 2015 follow-up article entitled "Your Water System Has Brain-Eating Amoeba, What Do You Do? Share Anti-Fracking Propaganda On Facebook!"[19]  Both uses by Hayride feature a slightly cropped version of the Groby Photograph appearing at the top of the article.[20]  Although both articles

---

[14] R. Doc. 34-4; R. Doc. 34-3, *Dermansky Decl.*, at ¶ 4. Dermansky registered the Groby Photograph with the United States Copyright Office under Reg. No. VA 2-100-104.  *See* R. Doc. 34-5.

[15] R. Doc. 34-3, *Dermansky Decl.*, at ¶ 6.

[16] *Id.*; R. Doc. 34-6.

[17] R. Doc. 34-3, *Dermansky Decl.*, at ¶ 6; R. Doc. 34-6.

[18] R. Doc. 34-7 at p. 2; R. Doc. 30-2, *McKay Decl.*, at ¶ 7.

[19] R. Doc. 34-7 at p. 3; R. Doc. 30-2, *McKay Decl.*, at ¶ 9.

[20] *Compare* R. Doc. 34-4 *with* R. Doc. 34-7.

contain criticism of Groby, the articles make no mention or criticism of the Groby Photograph itself.[21]

The Chambers Photograph depicts Baton Rouge resident and community organizer Gary Chambers standing in front of stacked piles of water-logged furniture and belongings damaged during the historic August 2016 flooding in Louisiana.[22] Dermansky alleges that she took the Chambers Photograph as part of an effort to "document the aftermath of the flood, particularly its effect on the greater Louisiana community."[23]  Chambers agreed to pose for Dermansky's photo shoot; Dermansky selected the location for the photo and directed Chambers on where to stand, how to position himself, and where to direct his gaze for the portrait.[24]  Dermansky took several photos of Chambers but ultimately chose only one—the Chambers Photograph—for publication.[25]  The Chambers Photograph was first published in a September 26, 2016 article written by Dermansky for RevealNews.org entitled "Wading through the aftermath of Louisiana's 1,000-year flood," in which the photo appeared alongside a credit to Dermansky.[26]  The Chambers Photograph also appears on Dermansky's personal website, jsdart.com, which includes copyright notices and watermarked versions of the photo.[27]

---

[21] *See* R. Doc. 30-2, *McKay Decl.*, at ¶¶ 8–9; R. Doc. 30-3 (Hayride's July 23, 2015 article); R. Doc. 30-4 (Hayride's July 27, 2015 article).
[22] *See* R. Doc. 34-9; R. Doc. 34-3, *Dermansky Decl.*, at ¶¶ 10–11. Dermansky registered the Chambers Photograph with the United States Copyright Office under Reg. No. VA 2-061-265.  *See* R. Doc. 34-10.
[23] R. Doc. 34-3, *Dermansky Decl.*, at ¶ 10.
[24] *Id.* at ¶ 11.
[25] *Id.* at ¶ 12.
[26] *Id.*; R. Doc. 34-11 at pp. 2–3.
[27] R. Doc. 34-3, *Dermansky Decl.*, at ¶ 12; R. Doc. 34-11 at p. 4.

The Chambers Photograph appears in six different articles published by Hayride: (1) a March 31, 2017 article entitled "Tasha Clark Amar's Defenders—Who Are The Usual Suspects—Come Out Of The Woodwork"; (2) a May 10, 2017 article titled "The Alton Sterling Fan Club Is Now Threatening to 'Shut Down' The Baton Rouge Metro Council"; (3) a June 18, 2017 article titled "Gary Chambers Called For A Riot In Baton Rouge This Weekend…"; (4) a July 11, 2017 article entitled "Marital Advice From Gary Chambers"; (5) a December 17, 2018 article titled "Coming Soon: State Senator…Gary Chambers?"; and (6) a May 7, 2019 article titled "Welcome To NBRED Week In Baton Rouge!"[28]  Each usage of the Chambers Photograph is identical; Hayride cropped a portion of the original image and superimposed the phrase "Everyday I'm Hustlin'" on the lefthand side of the photograph.[29]  As with Hayride's use of the Groby Photograph, the articles featuring the Chambers Photograph discuss and criticize Chambers but make no comment on or mention of the Chambers Photograph itself.[30]

Dermansky filed suit against Hayride on September 27, 2022, bringing claims for Direct Copyright Infringement under 17 U.S.C. § 101, *et seq.* and for Removal and/or Alteration of Copyright Management Information under the Digital Millennium Copyright Act, 17 U.S.C. § 1202(b).[31]  In short, Dermansky alleged that Hayride willfully and intentionally published the Groby and Chambers Photographs without her consent, with full knowledge of her copyright, and intentionally removed

---

[28] R. Doc. 34-12; R. Docs. 30-5, 30-7, 30-8, 30-9, 30-10, 30-11.
[29] R. Doc. 34-12.
[30] *See* R. Doc. 30-2, *McKay Decl.*, at ¶¶ 10–15; R. Docs. 30-5, 30-7, 30-8, 30-9, 30-10, 30-11.
[31] R. Doc. 1.

her copyright management information ("CMI") from the photographs to facilitate its infringement of her rights.[32]    Hayride subsequently filed a Motion for Partial Dismissal of Complaint under Fed. R. Civ. P. 12(b)(6) seeking the dismissal of Dermansky's § 1202(b) CMI-stripping claims for failure to state a claim upon which relief may be granted.[33]   The Court denied Hayride's Motion, finding that Dermansky had adequately stated a plausible claim for relief on her § 1202(b) claims.[34]   Hayride then filed an Answer to Dermansky's Complaint, raising an affirmative defense of fair use as to Dermansky's infringement claims and asserting a compulsory counterclaim for misuse of copyright and invalidity of copyright registrations.[35]

In its instant Motion for Summary Judgment, Hayride seeks the dismissal of Dermansky's copyright infringement claims on the grounds that Hayride's admitted uses of the Groby and Chambers Photographs constitute "fair use" within the meaning of 17 U.S.C. § 107 as well as the dismissal of Dermansky's § 1202(b) CMI stripping claims due to the lack of evidence to support such claims.[36]   Although Hayride denies infringement, Hayride contends that its use of the Groby and Chambers Photographs qualifies as fair use because: (1) its use was "transformative" in nature; (2) it acted in "good faith"; (3) the Groby and Chambers Photographs are more informational than creative and artistic in nature; (4) Hayride used as much of the Chambers and Groby Photographs as was reasonable and feasible to do; and (5)

---

[32] *See id.*
[33] R. Doc. 6.
[34] *See* R. Doc. 43.
[35] R. Doc. 51.
[36] R. Doc. 30.

its use did not affect the market for the photographs because Hayride and Dermansky serve different markets and Hayride has not attempted to license the images.[37] Alternatively, Hayride contends that if the Court does not find Hayride's use of the Chambers and Groby Photographs to constitute fair use, then the Court should declare Hayride to be an "innocent infringer," thereby reducing Dermansky's statutory damages award.[38]

In response, Dermansky filed a Cross-Motion for Partial Summary Judgment and Other Relief Under Rule 56 in which Dermansky argues that the Court should rule that Hayride's uses of the Chambers and Groby Photographs do not constitute fair uses and moves the Court under Federal Rule of Civil Procedure 56(d) to deny Hayride's summary judgment motion as it pertains to Dermansky's § 1202 claims because of ongoing discovery and unresolved material factual disputes.[39] Dermansky argues that Hayride's fair use defense fails as a matter of law because Hayride's uses of the Groby and Chambers Photographs were (1) non-transformative, for commercial purposes, and not in good faith, (2) the Photographs are highly creative and expressive works by Dermansky, (3) Hayride used substantially all of the Photographs, and (4) because Hayride's uses harm the market and value for Dermansky's work.[40]

---

[37] R. Doc. 30-1 at pp. 6–19.

[38] *Id.* at pp. 21–22.

[39] R. Doc. 34.   In addition to her Cross-Motion for Partial Summary Judgment, Dermansky contemporaneously filed a nearly identical response in opposition to Hayride's Motion for Summary Judgment. R. Doc. 35.  The Court considers both interchangeably.

[40] R. Doc. 34-1 at pp. 20–30.

Both parties filed a reply memorandum in support of their respective Motions. Hayride filed a joint reply memorandum and response in opposition to Dermansky's Cross-Motion, reiterating most of the arguments it initially raised in its own Motion and providing further support for its argument that its source for the Groby and Chambers Photographs did not contain Dermansky's CMI data.[41]   Hayride also argues that Dermansky's Rule 56(d) Motion should be denied because its own summary judgment motion as to the § 1202 CMI-stripping claims is not premature.[42]

Conversely, Dermansky's reply focuses on Hayride's alleged failure to properly address the second, third, and fourth factors of the fair use defense in its response in opposition to Dermansky's Motion.[43]   Dermansky contends that Hayride has failed to prove lack of market harm for her Photographs and that Hayride inappropriately shifted the burden to Dermansky to demonstrate market harm.[44]   Dermansky also argues that Hayride's use of the Groby and Chambers Photographs was not "transformative" because Hayride did not include any criticism or commentary on the works themselves, but only on the subjects of the Photographs.[45]

The Court granted Hayride leave to file a brief supplemental memorandum in which Hayride argues that email exchanges between Dermansky and an online publisher demonstrate that Dermansky was aware that her publisher's posting of her images online removed her CMI data from the photographs.[46]   Hayride maintains

---

[41] R. Doc. 54.
[42] *Id.* at pp. 5–6.
[43] R. Doc. 47.
[44] *Id.* at pp. 2–3.
[45] *Id.* at pp. 5–7.
[46] R. Doc. 56.

that this alleged admission by Dermansky is relevant to its fair use and innocent infringer defense because it supports Hayride's contention that it obtained the Photographs without knowledge of Dermansky's copyright because her images "were floating around the internet without identifying information as to source and without CMI."[47]  Dermansky objected to the relevance of this information and argued that it cannot satisfy Hayride's burden of proof for its Motion for Summary Judgment.[48]

## II.    LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[49]  A dispute is "genuine" if it is "real and substantial, as opposed to merely formal, pretended, or a sham."[50]  Further, a fact is "material" if it "might affect the outcome of the suit under the governing law."[51] When assessing whether a genuine dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[52]   While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only

---

[47] *Id.* at p. 3.
[48] R. Doc. 52.
[49] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).
[50] *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)).
[51] *Liberty Lobby*, 477 U.S. at 248.
[52] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citations omitted).

a scintilla of evidence."[53]  Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[54]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[55]  The non-moving party can then defeat summary judgment by either submitting evidence sufficient to demonstrate the existence of a genuine dispute of material fact or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[56]  If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[57]  The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[58]

## III.   ANALYSIS

The parties dispute whether Hayride has met its burden in proving its fair use affirmative defense of its use of the Groby and Chambers Photographs and whether

---

[53] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).

[54] *Id.* at 399 (citing *Liberty Lobby*, 477 U.S. at 248).

[55] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991).

[56] *Id.* at 1265.

[57] *See Celotex*, 477 U.S. at 322–23.

[58] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

Dermansky has met her burden in proving her § 1202 CMI-stripping claims. For the following reasons, the Court finds that Hayride has not demonstrated fair use and therefore grants summary judgment in favor of Dermansky on this issue. As for Dermansky's § 1202 claims, the Court declines to grant summary judgment at this point due to outstanding material factual disputes.

## A. Fair Use Defense[59]

"To promote the Progress of Science and useful Arts," the Constitution grants Congress the power to make laws which "secur[e] for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."[60] One such law, the Copyright Act of 1976, "encourages creativity by granting to the author of an original work 'a bundle of exclusive rights' . . . includ[ing] the rights to reproduce the copyrighted work, to prepare derivative works, and, in the case of pictorial or graphic works, to display the copyrighted work publicly."[61]

On occasion, however, "rigid application of the copyright statute . . . stifle[s] the very creativity which that law is designed to foster."[62] Indeed, the exclusive rights that copyright law awards an artist "can sometimes stand in the way of others

---

[59] Here, there are eight different challenged uses: two uses of the Groby Photograph by Hayride and six uses of the Chambers Photograph by Hayride. Although "each challenged use must be assessed on its own terms," *see Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1291 (2023) (Gorsuch, J., concurring), both parties treat each use as effectively the same throughout their briefing. The Court concurs, distinguishing between the different uses only when necessary, as both uses of the Groby Photograph and each of the six uses of the Chambers Photograph are essentially identical.

[60] U.S. Const. art. I, § 8, cl. 8.

[61] *Warhol*, 143 S. Ct. at 1273 (majority opinion) (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985) and citing 17 U.S.C. § 106).

[62] *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (quoting *Iowa State Univ. Rsch. Found., Inc. v. Am. Broad. Cos.*, 621 F.2d 57, 60 (2d Cir. 1980)).

exercising their own creative powers."[63]  As Justice Story explained long ago, "in truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout.  Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before."[64]

Cognizant of this reality, American and English courts have recognized for centuries a need to strike a balance between protecting an artist's property rights in their own works and allowing others to build upon or reference those protected works.[65]  Enter the fair use doctrine.  The fair use doctrine evolved to address the "inherent tension" between the rights of an artist and the public's need to use copyrighted material in a reasonable manner.[66]  Fair use is an "equitable rule of reason"[67] and context-sensitive inquiry that rejects the use of "bright-line rules."[68]  As summarized by Justice Story in *Folsom v. Marsh*, fair use "look[s] to the nature and objects of the selections made, the quantity and value of the materials used, and the degree in which the use may prejudice the sale, or diminish the profits, or supersede

---

[63] *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1195 (2021) (citations omitted).

[64] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (No. 4,436) (C.C.D. Mass. 1845)).

[65] *See id.* at 575–76 (describing the historic English and early American approaches toward copyright law and fair use).

[66] *Id.* at 575; *accord Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("[The Copyright Act] reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.").

[67] *Stewart*, 495 U.S. at 236 (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984)).

[68] *Campbell*, 510 U.S. at 577.

the objects, of the original work."[69]  Section 107 of the Copyright Act of 1976 codifies

the common law fair use doctrine and provides as follows:

> Notwithstanding the provisions of sections 106 and 106A,
> the fair use of a copyrighted work, including such use by
> reproduction in copies or phonorecords or by any other
> means specified by that section, for purposes such as
> criticism, comment, news reporting, teaching (including
> multiple copies for classroom use), scholarship, or research,
> is not an infringement of copyright.   In determining
> whether the use made of a work in any particular case is a
> fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether
> such use is of a commercial nature or is for nonprofit
> educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in
> relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or
> value of the copyrighted work.[70]

These four statutory fair use factors are not exclusive nor is any single factor

dispositive; the doctrine "calls for case-by-case analysis."[71]  For instance, where

copyrighted material "serves an artistic rather than a utilitarian function" a fair use

defense is less likely to succeed.[72]  Moreover, because fair use is a "'flexible' concept,"[73]

"[a]ll [factors] are to be explored, and the results weighed together, in light of the

purposes of copyright."[74]  That being said, courts routinely give greater weight to the

---

[69] *Folsom v. Marsh*, 9 F. Cas. 342, 348 (No. 4,901) (C.C.D. Mass. 1841).
[70] 17 U.S.C. § 107.
[71] *Campbell*, 510 U.S. at 577.
[72] *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021).
[73] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1274 (2023) (quoting *Google*, 141 S. Ct. at 1197).
[74] *Campbell*, 510 U.S. at 578.

first and fourth fair use factors.[75]  Finally, although fair use involves mixed questions of fact and law, a court may resolve the defense on summary judgment so long as material facts are not in dispute.[76]

### 1.  The Purpose and Character of the Use

The first factor—"the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"[77]—requires a court to consider whether a particular use is "commercial" in nature, the extent to which the use is "transformative," and whether the user acted in good faith.[78]  "The 'central' question it asks is 'whether the new work merely "supersede[s] the objects" of the original creation . . . ("supplanting" the original), or instead adds something new, with a further purpose or different character.'"[79]  That a secondary use adds something new to a copyrighted material does not alone render such use fair; "[r]ather, the first factor . . . asks 'whether *and to what extent*'" a use differs in character and purpose than the original, with a larger difference more likely to weigh in favor of fair use.[80]  The Court addresses each consideration separately.

### i.  Commercial Use

The first statutory factor directs the Court to consider whether Hayride's use of the Groby and Chambers Photographs was commercial in nature.  Commerciality

---

[75] *See Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 321 (5th Cir. 2022).

[76] *See id.* at 320; *see also Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 36 (2d Cir. 2021) ("While fair use presents a mixed question of law and fact, it may be resolved on summary judgment where, as here, the material facts are not in dispute."), *cert. granted*, 142 S. Ct. 1412 (2022), *and aff'd sub nom. Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023).

[77] 17 U.S.C. § 107(1).

[78] *Bell*, 27 F.4th at 321–322.

[79] *Warhol*, 143 S. Ct. at 1274 (quoting *Campbell*, 510 U.S. at 579).

[80] *Id.* at 1275 (quoting *Campbell*, 510 U.S. at 579).

considers "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."[81]  While the commercial nature of a use is "not dispositive . . . it is relevant" and must "be weighed against the degree to which the use has a further purpose or different character."[82]  The more "transformative" the use, the less weight that is given to the commercial aspect of the use.[83]

There is no dispute that Hayride received money from its use of the Chambers and Groby Photographs by way of advertising revenue generated by the number of views garnered by each article.[84]  Hayride contends, however, that the Court should consider the relatively meager sums involved—several hundred dollars in revenue— and that Hayride's "website is more of an avocation done out of McKay's passion for politics and social commentary than a means to raise money" in weighing this factor.[85]  The inquiry into commerciality does not turn on the size of the user's operation nor does it require a court to consider the relative importance to the alleged infringer of the commercial reasons for a use.[86]  After all, "the crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary

---

[81] *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).

[82] *Warhol*, 143 S. Ct. at 1276 (citing *Campbell*, 510 U.S. at 579).

[83] *Campbell*, 510 U.S. at 579 ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.").

[84] R. Doc. 30-2, *McKay Decl.*, at ¶ 20; R. Doc. 30-13 at ¶ 18.

[85] R. Doc. 30-1 at p. 13.

[86] *See Harper & Row Publishers, Inc.*, 471 U.S. at 562 ("In arguing that the purpose of news reporting is not purely commercial, The Nation misses the point entirely.").  *Cf. Iowa State Univ. Rsch. Found., Inc. v. Am. Broad. Cos., Inc.*, 621 F.2d 57, 61 (2d Cir. 1980) ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance.").

gain[.]"[87]  Rather, the inquiry concerns whether an infringer "stands to profit from exploitation of the copyrighted material without paying the customary price."[88]

Hayride's non-commercial reasons for using the Chambers and Groby Photographs, which it describes as "negative commentary and criticism of the subjects of the photos," do not cancel out the fact that Hayride made money off its use of those Photographs without having to pay any licensing fee.  Hayride received a direct, albeit small, commercial benefit by using Dermansky's work.  Simply because Hayride is a small one-man news shop does not give it any greater leeway to exploit copyrighted material than a sophisticated media outlet.

Moreover, because the commercial nature of the use "loom[s] larger" when a use is not "transformative,"[89] the Court affords greater weight to the commercial nature of Hayride's uses given its conclusion, addressed below, that Hayride's uses of the Groby and Chambers Photographs were not "transformative."

### ii. **Transformative**

The main point of contention between the parties is the extent to which Hayride's uses of the Groby and Chambers Photographs are "transformative" in nature, particularly in light of the Supreme Court's recent pronouncement on the subject in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*.[90]  A use is "transformative" when it "has a further purpose or different character" than that of

---

[87] *Harper & Row Publishers, Inc.*, 471 U.S. at 562.
[88] *Id.*
[89] *Campbell*, 510 U.S. at 580.
[90] 143 S. Ct. 1258 (2023).

the original.[91]  Put differently, a transformative use is one that "alter[s] the first [work] with new expression, meaning, or message."[92]  As with many of the fair use considerations, "'transformativeness' is a matter of degree."[93]  While "transformative use is not absolutely necessary for a finding of fair use," its absence increases the significance of other factors, like commercialism.[94]

In *Andy Warhol*, the Supreme Court clarified that the "central question" of whether a use is "transformative" depends on "whether the new use served a purpose distinct from the original, or instead superseded its objects."[95]  There, the Court confronted the extent to which Andy Warhol's colorful silkscreen portraits of musician Prince were "transformative" of photographer Lynn Goldsmith's original photograph upon which Warhol's creations were based.[96]  In finding Warhol's uses not "transformative," the Court explained that simply because a secondary work "adds a new aesthetic or new expression to its source material," such changes do not qualify as "transformative" in nature.[97]  "[O]therwise, the law may well 'recogniz[e] any alteration as transformative.'"[98]  That Warhol presented Prince in his own signature pop art style by changing the coloration and aesthetic of Goldsmith's

---

[91] *Id.* at 1273.

[92] *Id.* at 1282 (quoting *Campbell*, 510 U.S. at 579) (alterations in original).  *But see id.* ("*Campbell* cannot be read to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message.  Otherwise, 'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works.").

[93] *Id.* at 1275.

[94] *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 323 (5th Cir. 2022) (quoting *Campbell*, 510 U.S. at 579).

[95] *Warhol*, 143 S. Ct. at 1282.

[96] *See id.* at 1267–1271 (displaying images of the works at issue).

[97] *Id.* at 1283 (quoting *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 36 (2d Cir. 2021)).

[98] *Id.* at 1284 (quoting *Goldsmith*, 11 F.4th at 36).

original image was irrelevant to whether such use was "transformative."[99] Nor, the Court noted, was Warhol's subjective intent relevant.[100] Rather, as the Court explained, "[w]hether the purpose and character of a use weighs in favor of fair use is, instead, an objective inquiry into what use was made, *i.e.*, what the user does with the original work."[101] In Warhol's case, the Court found that the purpose of his use of Goldsmith's original Prince image was "substantially the same as that of Goldsmith['s] [use] . . . [b]oth are portraits of Prince used in magazines to illustrate stories about Prince."[102] Despite their aesthetic differences, both Goldsmith's original image and Warhol's silkscreen version had the same ultimate purpose—to accompany an article about Prince. And because the purpose was the same, Warhol's use was not "transformative."

*Andy Warhol* directly controls the instant case and forecloses Hayride's argument that its use of the Groby and Chambers Photographs was "transformative." *Andy Warhol* requires this Court to examine both Dermansky's original purpose and use of the Chambers and Groby Photographs and Hayride's use of those same images to determine whether Hayride's use was "transformative."[103] The facts in this case are not in dispute; both Dermansky and Hayride used the Groby and Chambers Photographs as illustrative aids for online news articles.[104] Dermansky captured the

---

[99] *Id.* at 1284–85.

[100] *Id.* at 1284 ("Nor does the subjective intent of the user (or the subjective interpretation of a court) determine the purpose of the use.").

[101] *Id.*

[102] *Id.* at 1278; *see also id.* at 1284 ("The purpose of that use is, still, to illustrate a magazine about Prince with a portrait of Prince.").

[103] *Id.* at 1282–83.

[104] *See* R. Doc. 34-3, *Dermansky Decl.*, at ¶¶ 6, 12; R. Doc. 34-6; R. Doc. 30-2, *McKay Decl.*, at ¶¶ 7–15.

Groby Photograph and first used it to accompany an online article she authored for the DeSmog blog, later republished verbatim with her authorization on Truthout.org.[105]   Similarly, Dermansky captured the Chambers Photograph to illustrate an article that she wrote about Chambers for RevealNews.org.[106]  Likewise, Hayride used both the Groby and Chambers Photographs to accompany various articles written about the respective subjects of the photographs.[107]   Just as the purpose of Warhol's Prince and Goldsmith's Prince was ultimately to accompany news articles about Prince, so too are Hayride's and Dermansky's uses of the Chambers and Groby Photographs meant to accompany articles about the subjects of the photographs.   Because both Hayride and Dermansky used the Groby and Chambers Photographs for the same purpose, Hayride's use is not "transformative."[108]

Hayride's attempt to escape this conclusion is unconvincing.  Hayride does not contest that both it and Dermansky used the Groby and Chambers Photographs for the purpose of illustrating news articles; instead, Hayride focuses on the tone and point of view of the articles that follow the images.  Hayride latches on to § 107's inclusion of "criticism" and "commentary" as examples of possible fair use to justify

---

[105] *See* R. Doc. 34-3, *Dermansky Decl.*, at ¶ 6; R. Doc. 34-6.

[106] *See* R. Doc. 34-3, *Dermansky Decl.*, at ¶ 12; R. Doc. 34-11.

[107] R. Doc. 30-2, *McKay Decl.*, at ¶¶ 7–15.

[108] Neither party has addressed whether the addition, by Hayride or someone else, of the words "Everyday I'm Hustlin'" to the Chambers Photograph has any bearing on whether Hayride's use was "transformative." Nevertheless, the Court finds that the modification of the original image is not so great as to be "transformative" because the change goes merely to the aesthetics of the image and does not affect the purpose of the challenged use—to accompany an article about Chambers.  Aesthetic changes alone are not "transformative."  *See Warhol*, 143 S. Ct. at 1282 ("*Campbell* cannot be read to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message.").

its own use of the Groby and Chambers Photographs.[109]  While Dermansky's articles either approve of or support, implicitly or explicitly, both Groby and Chambers as individuals, Hayride maintains, its own "articles or posts are written by a conservative author critically examining and commenting upon the politics and policies and actions of Groby and Chambers."[110]  Hayride further includes a lengthy footnote explaining that Dermansky and McKay, the author of Hayride's articles, "are on opposite ends of the political spectrum," and thus "speak to entirely different audiences."[111]  These political distinctions, Hayride argues, mean that its use of the Groby and Chambers Photographs is "transformative."  Distilled to its essence, Hayride's argument is that so long as an infringer uses a copyrighted photograph in conjunction with textual commentary on the subject of that photograph that differs in perspective from that of the original use, then such use is "transformative."

Hayride's argument sweeps far too broadly.  The statutory language of § 107 and binding Supreme Court precedent directly refute Hayride's argument.  Hayride conflates use for the purpose of "criticism" of or "comment" on an original with use for the purpose of providing a visual accompaniment to textual "criticism" or "commentary" untethered to the original.  Put differently, Hayride confuses its purpose in using the Groby and Chambers Photographs—illustration—with its

---

[109] Even if the Court were to find that Hayride used Dermansky's images for the purpose of "criticism" or "commentary," that finding alone would not be dispositive as to the fair use analysis.  The listing of examples in § 107 "was not intended to be exhaustive . . . or to single out any particular use as presumptively a 'fair' use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985).  "[W]hether a use referred to in the first sentence of section 107 is a fair use in a particular case will depend upon the application of the determinative factors, including those mentioned in the second sentence." *Id.* (quoting S. Rep. No. 94–473, p. 62 (1975)).

[110] R. Doc. 30-1 at p. 8.

[111] *Id.* at p. 10 n.1.

purpose in publishing the articles about Groby and Chambers—criticism.[112]  By its very text, section 107 requires courts to look at the purpose of the challenged use itself, not to the purpose of what accompanies the use.[113]  While Hayride is correct that § 107 specifies that uses for "criticism, comment, [or] news reporting" may constitute fair use, Hayride ignores that it did not use the Groby or Chambers Photographs to either criticize or comment on the works themselves.

"Criticism," as that term is used in § 107, means "[c]riticism *of a work*" which "ordinarily does not supersede the objects of, or supplant, the work.  Rather, it uses the work to serve a distinct end."[114]  The "meaning of a secondary work, as reasonably can be perceived, should be considered to the extent necessary to determine whether the purpose of the use is distinct from the original, for instance, because the *use comments on, criticizes, or provides otherwise unavailable information about the*

---

[112] *See Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 62 (E.D.N.Y. 2021) ("'Display of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story *about* that work.' That situation is distinct from an author who lifts someone else's copyrighted material because it provides an attractive image to go along with the story he is reporting.") (internal citations omitted).

[113] *See Warhol*, 143 S. Ct. at 1289 (Gorsuch, J., concurring) ("[T]he statute indicates that a court must examine the purpose of the particular use under challenge, not the artistic purpose underlying a work.").  This is not to say that what accompanies the challenged use is irrelevant as the surrounding context often informs the purpose of the challenged use itself.  For instance, a book review that contains passages from the book being reviewed provides necessary context as to the purpose of why the author chose to copy passages of copyrighted material.  Even so, the fair use inquiry is still directed at the purpose of the use itself.  *See id.* at 1274 n.4 (majority opinion) ("[T]here may be compelling reason to borrow from the original to achieve that purpose because the review targets the material for comment or criticism.  But again, the question of justification will depend on the individual use or uses.").

[114] *Id.* at 1274 (majority opinion); *see also Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 41 (2d Cir. 2021) ("[W]here a secondary work does not obviously comment on or relate back to the original or use the original for a purpose other than that for which it was created, the bare assertion of a 'higher or different artistic use,' is insufficient to render a work transformative.") (internal citations omitted).

*original.*"[115]  For example, in *Warhol*, the Court contrasted Warhol's iconic Campbell's Soup Cans series, which "comment[s] on consumerism" and "'conjures up' the original work to 'she[d] light' *on the work itself*, not just the subject of the work," with his use of Goldsmith's Prince photo, which "does not target the [original] photograph."[116] Because Warhol's Prince series "has no critical bearing on" Goldsmith's photograph, the Court explained, Warhol's "'claim to fairness in borrowing from' [Goldsmith's] work 'diminishes accordingly (if it does not vanish).'"[117]

Here, none of Hayride's articles make any mention or criticism whatsoever of Dermansky's images.  That an image accompanies a work of criticism does not mean that the purpose of the use of the image itself is for criticism.  Hayride admits as much in its own memorandum in support of its Motion, stating that "Hayride used the photos for news reporting and criticism of Groby and Chambers . . . and to criticize the subjects of the photos."[118]  While "commentary or criticism that *targets an original work* may have compelling reason to 'conjure up' the original by borrowing from it[,]"[119] where, as here, Hayride's criticism does not "target" or comment on the Groby and Chambers Photographs, such use is not "transformative."  Hayride's articles "can stand on [their] own two feet"[120] without the Groby and Chambers Photographs, demonstrating that whatever "criticism" or "commentary" contained in those articles

---

[115] *Warhol*, 143 S. Ct. at 1284 (emphasis added) (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215–16 (2d Cir. 2015)).

[116] *Id.* at 1281 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, 588 (1994)) (emphasis added).

[117] *Id.* at 1285 (quoting *Campbell*, 510 U.S. at 580).

[118] R. Doc. 30-1 at p. 8.

[119] *Warhol*, 143 S. Ct. at 1276 (quoting *Campbell*, 510 U.S. at 588).

[120] *Id.* at 1276 (quoting *Campbell*, 510 U.S. at 580–81).

is not directed at the Photographs themselves.[121]  Further, as the Supreme Court has explained:

> If . . . commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.[122]

Moreover, the fact that Dermansky and Hayride have opposing opinions of Groby and Chambers as public figures has no bearing on the purpose of the use—to illustrate a news article.  The Supreme Court rejected a similar argument in *Warhol*. It was irrelevant to whether Warhol's use was "transformative," the Court stated, that Goldsmith's photographs of Prince showed that he "is 'not a comfortable person' and that he is 'a vulnerable human being'" while Warhol's Prince series depicted "'Prince as a kind of icon or totem of something,' a 'mask-like simulacrum of his actual existence.'"[123]  That Goldsmith and Warhol commented on Prince as a subject and portrayed Prince in different ways had no bearing as to what the purpose of their respective uses were.[124]

Likewise, that Dermansky's articles featured one perspective and Hayride's another does not change the underlying purpose of the respective uses.  Again,

---

[121] To that point, the Court notes that the Hayride articles in dispute are still published on Hayride's blog and publicly accessible, albeit without any of Dermansky's photographs.  See R. Doc. 30-2, *McKay Decl.*, at ¶¶ 7, 9–16.

[122] *Campbell*, 510 U.S. at 580.

[123] *Warhol*, 143 S. Ct. at 1284.

[124] *See id.* ("Although the purpose could be more specifically described as illustrating a magazine about Prince with a portrait of Prince, one that portrays Prince somewhat differently from Goldsmith's photograph (yet has no critical bearing on her photograph), that degree of difference is not enough for the first factor to favor AWF, given the specific context of the use.").

Hayride mixes up the reasons why it chose to use the Groby and Chambers Photographs with the reasons why it chose to write the particular articles on Groby and Chambers.  The upshot of Hayride's argument is that whether a particular use of copyrighted material is "transformative" depends wholly on the point of view of the infringer: agree with the point of view of the original copyright holder and face an infringement lawsuit, disagree and be protected under the fair use doctrine.  In the context of the Chambers and Groby Photographs, accepting Hayride's argument would lead to the absurd conclusion that had it published articles supportive of Chambers and Groby, such uses would *not* have been "transformative."  Fair use does not and cannot depend on such considerations entirely divorced from the purpose of the uses themselves.[125]  Courts "should not attempt to evaluate the artistic significance of a particular work,"[126] nor, for that matter, should courts indulge in considering ideological and political distinctions between the parties.  The Copyright Act does not "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."[127]

To hold otherwise would eviscerate copyright protection by granting legal privilege to infringers who could use copyrighted material without limit so long as they also included unrelated commentary or criticism.  In the realm of photography, accepting Hayride's argument would allow news media to use a work without

---

[125] *See id.* at 1289 (Gorsuch, J., concurring) ("It's a comparatively modest inquiry focused on how and for what reason a person is using a copyrighted work in the world, not on the moods of any artist or the aesthetic quality of any creation.").

[126] *Id.* at 1283 (majority opinion) (citing *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903)).

[127] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992) (Scalia, J.).

attribution or authorization and argue "transformative" use so long as the point of view of the article is negative toward the subject of the work.[128]  Such a rule would swallow whole a photographer's property rights in their own work.  Under Hayride's theory, "[a]s long as the user somehow portrays the subject of the photograph differently, he could make modest alterations to the original, sell it to an outlet to accompany a story about the subject, and claim transformative use."[129]  Moreover, numerous district courts have rejected arguments similar to Hayride's for effectively eliminating copyright protection for photographs so long as a photograph is used to accompany an article about the subject of the photograph.[130]

Hayride's almost singular reliance on *Dhillon v. Does 1–10*[131], an unpublished district court opinion from outside this Circuit, does not support its contention that its use of the Groby and Chambers Photographs was "transformative."  *Dhillon* involved an online blog's use of a professional headshot of a local attorney and political candidate to illustrate an article criticizing the candidate.[132]  That court determined that the defendant blog's use of the headshot was "transformative"

---

[128] *Cf. Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 61 (E.D.N.Y. 2021) ("[A]lthough the Copyright Act, at 17 U.S.C. § 107, cites 'news reporting' as one method of fair use, 'the promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report.'" (quoting *Cruz v. Cox Media Grp., LLC*, 444 F. Supp. 3d 457, 467 (E.D.N.Y. 2020))).

[129] *Warhol*, 143 S. Ct. at 1285.

[130] *See, e.g.*, *Golden*, 524 F. Supp. 3d at 61–62; *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) ("CMG's articles did not comment on, criticize, or report news *about the Images themselves*; instead, they used the Images as illustrative aids because they depicted the subjects described in its articles.  CMG's argument, if accepted, would eliminate copyright protection . . . ."); *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F .Supp. 4 395, 406 n.6 (S.D.N.Y. 2016) ("Defendant confuses the situation in which the photograph is the story . . . and the scenario present here, in which the contents of the photograph are of some public interest . . . .  Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job.").

[131] No. C 13-01465 SI, 2014 WL 722592 (N.D. Cal. Feb. 25, 2014).

[132] *Id.* at *1.

because the purpose of the blog's use differed from the original purpose of the image.[133]   Specifically, the court found the secondary use "transformative" because the plaintiff "used the headshot photo in connection with [her] campaign, as well as in connection with other political activities and professional marketing efforts[,]" while the defendant "used the headshot photo as part of its criticism of, and commentary on, the plaintiff's politics."[134]   That change in purpose from use as a marketing tool to use as an illustrative aid, the court held, qualified as a "transformative" use.[135]

Here, there is no real distinction in the purpose of the uses between Dermansky and Hayride: to provide illustration for online articles.  Although Hayride broadly reads *Dhillon* to support its argument that a use is "transformative" if the purpose of the original use is to positively portray the subject while the purpose of the challenged use is to criticize the subject, Hayride's argument oversimplifies the court's explanation in *Dhillon* and ignores the distinct purposes of the different uses in that case: the original as a political marketing tool and the other as an image to accompany a blog post.  Again, Hayride confuses the purpose for a particular use with the purpose of materials accompanying the use.  Moreover, to the extent that Hayride reads *Dhillon* to support its argument that a use of an image is "transformative" so long as it accompanies a work of criticism—but does not actually comment on or criticize an original work itself—such reading contradicts both the language of § 107

---

[133] *Id.* at *5.

[134] *Id.*

[135] *Id.* Unlike here, the court also found the defendant's use to be non-commercial. *See id.* at *4.

and Supreme Court caselaw, for the above-discussed reasons.  Accordingly, the Court does not find *Dhillon* to be of assistance to Hayride on the issue of "transformativeness."

Because Hayride used the Groby and Chamber's Photographs for the same purpose as Dermansky originally did, the Court finds that Hayride's uses of those Photographs were not "transformative."  And given that the commerciality of the use "loom[s] larger" where such use is not "transformative," the first fair use factor tips strongly against a finding of fair use.

### iii.    Good Faith

The good faith of an alleged infringer does not excuse infringement.[136] "Nevertheless," the Fifth Circuit has explained, "because 'fair use presupposes good faith and fair dealing,' the propriety of the defendant's conduct does factor into 'the equitable balance of a fair use determination.'"[137]  Good faith alone, however, is insufficient to carry the burden of proof on the first factor by the party asserting the fair use defense.[138]  Dermansky contends that Hayride acted in bad faith because Hayride either knew or should have known that she was the author of the Groby and Chambers Photographs and failed to acknowledge to credit her.[139]  Hayride counters with a lengthy discussion of how it allegedly first found the Groby and Chambers

---

[136] *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 322 (5th Cir. 2022) (citing *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000)).

[137] *Id.* (quoting *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986)).

[138] *Id.*; *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994) (suggesting that the good faith of an infringer may be of little to no weight in the fair use analysis).  Notably, the Supreme Court did not address good faith as part of its analysis of the first fair use factor in *Warhol*.

[139] *See* R. Doc. 34-1 at pp. 25–26.

Photographs and denies having found them on any of Dermansky's publications and further denies having had any knowledge that the Photographs were Dermansky's.[140]

Despite the parties' factual dispute, the Court does not find this dispute to preclude summary judgment because Hayride nevertheless fails to demonstrate that it satisfies the fair use defense, regardless of whether it acted in good or bad faith. Only *material* disputes of fact preclude a court from granting summary judgment. As the Court explains, the fair use factors weigh against a finding of fair use. Even if the Court were to find good faith on Hayride's part, Hayride has not demonstrated that it is entitled to a fair use defense. Good faith is at most a necessary but never sufficient condition to establish fair use. Because the Court has determined that Hayride's use of the Chambers and Groby Photographs was not "transformative" and was commercial in nature, the first factor weighs against Hayride.

### 2.  The Nature of the Copyrighted Work

The second fair use factor examines "the nature of the copyrighted work" including the extent to which the work is expressive or creative rather than informational or factual and whether the work is published or unpublished.[141]  In general, fair use is more difficult to establish where a work is creative rather than informational.[142]  Additionally, the scope of fair use is "narrower with respect to

---

[140] *See* R. Doc. 30-1 at pp. 11–13; R. Doc. 54 at pp. 1–4; R. Doc. 56.
[141] *Bell*, 27 F.4th at 323.
[142] *Stewart v. Abend*, 495 U.S. 207, 237 (1990).

unpublished works."[143]   Nevertheless, this factor "is widely considered the least significant fair-use factor."[144]

As a general rule, courts consider photographs to be creative, artistic expressions of their author deserving "thick copyright protection."[145]   Indeed, "[a]lmost any photograph 'may claim the necessary originality to support a copyright.'"[146]   That being said, not every photograph is necessarily "expressive" in nature, particularly where a photograph documents a factual event, is "informative" in nature, and does not involve artistic consideration.[147]

The Court finds that the Groby and Chambers Photographs fall on the creative side of the line and, thus, that the second fair use factor tips toward Dermansky.   As for the Groby Photograph, Dermansky explains that she "considered various visual elements including the natural lighting of the subjects, the depth of field of the image, the position of [her] camera, the angle of [her] shot, and the overall emotional impact of the composed image[,]" and specifically composed the image "using a large depth of field in order to capture Councilman Groby, an elected official advocating for environmental justice, juxtaposed with his constituents, so that both Groby and the protestor's signs would be in sharp focus."[148]   Further, Dermansky claims that after

---

[143] *Bell*, 27 F.4th at 323 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563–64 (1985)).

[144] *Id.*

[145] *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 267 (4th Cir. 2019) (quoting *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012)).

[146] *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 450 (S.D.N.Y. 2005) (quoting 1 Nimmer On Copyright § 2.08[E][1], at 2–129).

[147] *See, e.g.*, *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 354 (S.D.N.Y. 2017) (explaining circumstances in which a photograph may be considered "factual" as opposed to "creative").

[148] *See* R. Doc. 34-3, *Dermansky Decl.*, at ¶ 5.

narrowing down forty-one different photographs that she took of Groby to select the Groby Photograph, she made several edits to the work with computer photo-editing software before publishing her photo.[149]

A similar creative process took place for the Chambers Photograph. Dermansky explains that she deliberately composed this image to "provide the viewer a sense of the severity of the storm's aftermath and the community's emotional response to it" and personally "selected the specific location for this Photograph, and directed Mr. Chambers where to stand, how to position himself, and where to direct his gaze in order to create this portrait."[150]  She also "used a narrow depth of field to focus on Mr. Chambers as the photo subject, while blurring the background of the photograph to further enhance the focus on Mr. Chambers, while making sure to capture the piles of debris from the flooded homes in the background."[151]  As with the Groby Photograph, Dermansky edited the Chambers Photograph with editing software.[152]

The uncontradicted record evidence demonstrates that both the Groby and Chambers Photographs involved deliberate and intentional creative choices by Dermansky to portray the subjects of her Photographs in particular ways.  Hayride disputes this, contending that the Chambers and Groby Photographs are informative in nature, thus "mov[ing] the needle" towards fair use.[153]  Hayride argues that while

---

[149] *See id.* at ¶ 6.
[150] *See id.* at ¶ 11.
[151] *See id.*
[152] *See id.*
[153] R. Doc. 30-1 at p. 16.

both photographs are "good photo[s]," they "simply document events," lack "apparent artistic significance," and do not involve "special lighting or make-up or staging or preparation by the photographer[.]"[154]   "[I]t is hard to imagine," Hayride contends, "that anyone else with a steady hand, professional or amateur, could not have captured the same image[s]."[155]

The Court rejects Hayride's invitation to consider the underlying merit or artistic quality of the photographs in considering whether or not they are creative in nature.   Courts must refrain from attempting to judge the artistic significance of particular works.[156]   As Justice Holmes explained, "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits."[157] Whether or not someone else could have also captured the Groby and Chambers Photographs is not a proper consideration for this Court to make and does not bear on whether the works are creative or not.   The second fair use factor asks only whether a work is creative in nature, not whether it is the *most* creative.   That other photographs at issue in other cases, such as in the case cited by Hayride, *Murphy v. Millennium Radio Group, LLC*,[158] are arguably more creative and more expressive than either the Chambers or Groby Photographs does not mean that any work falling

---

[154] *Id.* at p. 15.
[155] *Id.*
[156] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1283 (2023).
[157] *Id.* at 1283–84 (quoting *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903)).
[158] 650 F.3d 295 (3d Cir. 2011).

short of that high bar is not deemed "creative." The Copyright Act protects more than just Annie Leibowitz and Ansel Adams.

Moreover, the Groby and Chambers Photographs are not simply factual and informational in nature, as Hayride claims. Contrary to Hayride's argument, the Chambers Photograph, at the very least, did involve "staging or preparation by the photographer," with Dermansky personally selecting the location for the pre-planned photoshoot with Chambers.[159] And while the Groby Photograph is more candid in nature, that does not obviate the several artistic choices that Dermansky made in capturing that photo, as detailed above.

Hayride provides no explanation as to how the Groby and Chambers Photographs are factual in nature. That the Photographs "document events" does not mean that there is no creative element to them. There is no inherent tension between a creative, expressive work and one that captures and documents events. Indeed, courts routinely find photographs to be expressive works even where the photographs capture an event or happening.[160] The distinction falls not on what a photograph's subject matter is but on how the photographer chooses to capture that image. And here, because Dermansky deliberately composed her images with consideration of, *inter alia*, backdrop and depth of field and later edited them with photo-editing software, the Court finds the second factor to weigh against fair use and in

---

[159] *See* R. Doc. 34-3, *Dermansky Decl.*, at ¶ 10.
[160] *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012) ("Simply because a photo documents an event does not turn a pictorial representation into a factual recitation of the nature referenced in *Harper & Row*.").

Dermansky's favor.  Nonetheless, this factor carries little weight in the overall analysis.

### 3.  The Amount and Substantiality of the Use

The third fair use factor—"the amount and substantiality of the portion used in relation to the copyrighted work as a whole"[161]—requires the Court to "consider whether the amount copied is either a quantitatively or qualitatively significant part of the original."[162]  In assessing this factor, the Court looks to whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying."[163]  There is no bright line separating a permissible from an impermissible amount of copying; even a small amount of copying may weigh against fair use where the copying captures "the heart" of a work.[164]  This factor has less weight when considering photographs as compared to texts or musical compositions because "all or most of the work often must be used in order to preserve any meaning at all."[165]

Here, Hayride does not dispute that it used a substantial portion of the "heart" of the Groby and Chambers Photographs.  Instead, Hayride argues that this factor is neutral because, even though Hayride used substantially all of the Groby and Chambers Photographs, it would not have been feasible for Hayride to use any less than it did.  That is, Hayride contends that it used as much of the Groby and

---

[161] 17 U.S.C. § 107(3).

[162] *See Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 324 (5th Cir. 2022) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)).

[163] *Campbell*, 510 U.S. at 586 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (No. 4,901) (C.C.D. Mass. 1841)).

[164] *Bell*, 27 F.4th at 324 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985)).

[165] *Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 188 (D. Mass. 2007).

Chambers Photographs as was reasonable under the circumstances and that what was reasonable happened to be the majority of the original works.

In the context of the specific photos at issue here, it is understandable that Hayride used a substantial portion of the images, cropping them slightly only around the margins; it would have made little sense for Hayride to have used the Groby and Chambers Photographs with both subjects removed.  As discussed with the first factor, the purpose of both the original use and Hayride's use was to illustrate news articles with images of the subjects of the articles.  Indeed, the very fact that Hayride copied a substantial portion of the original works "reveal[s] a dearth of transformative character or purpose under the first factor."[166]  However understandable Hayride's choices may have been from the standpoint of providing visual accompaniment to a blog post, that does not change the fact that Hayride reproduced a very substantial portion of Dermansky's work.

Hayride again relies on *Dhillon* to support its argument that where it would not have been feasible for an alleged infringer to copy any less of a work, the third fair use factor is neutral.  The Court disagrees.  Hayride's argument goes to the respective weight assigned to the third factor, not to whom it favors.[167]  In the context of photography, it is likely that an infringer will use only a "feasible" amount of the original work and it may well be impossible to use any less.  That reality requires courts to assign a different weight to this factor than if someone had copied the entirety of a novel, symphony, or comparable work.  After all, copying the Groby

---

[166] *Campbell*, 510 U.S. at 587.
[167] *See Fitzgerald*, 491 F. Supp. 2d at 188.

Photograph is not comparable to copying the entirety of *The Godfather* or Wagner's *Götterdämmerung*. However, calling this factor neutral would be to completely ignore the factor and edit out the statutory text. Hayride used a substantial portion of Dermansky's original works, the exact consideration the third factor requires courts to weigh. While this factor does not weigh heavily in the Court's analysis, it falls against finding fair use.

### 4. Effect of the Use on the Market for the Copyrighted Work

The fourth fair use factor looks to "the effect of the use" on the value of and market for the copyrighted work and is "undoubtedly the single most important element of fair use."[168] Courts consider both actual market harm and "whether widespread use of the work in the same infringing fashion 'would result in a substantially adverse impact on the potential market' for the original work and any derivatives."[169] In assessing market harm, courts look not to whether a work *damages* the market for the original, "but whether it *usurps* the market for the first by offering a competing substitute."[170] As the Supreme Court has explained, "when a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects,' of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur."[171] As with every fair use factor, the party invoking the defense bears the burden of proof.[172]

---

[168] *Bell*, 27 F.4th at 324 (quoting *Harper & Row*, 471 U.S. at 566).

[169] *Id.* (quoting *Campbell*, 510 U.S. at 590).

[170] *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021) (*citing Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)).

[171] *Campbell*, 510 U.S. at 590.

[172] *Id.*

Dermansky makes money as a photographer, in part, by licensing her work. The Chambers and Groby Photographs are no exception.[173]  Dermansky argues that Hayride's use and publication of those images harms her ability to license the images because they can now be obtained for free directly from Hayride's website rather than by paying her a licensing fee.[174]  Hayride counters that its own uses of the Chambers and Groby Photographs do not act as market substitutes for Dermansky's original work because Dermansky and Hayride "operate in different spheres politically, socially, and commercially" and because Hayride has never attempted to license or sell the Groby and Chambers Photographs to anyone else.[175]

Hayride conflates the market for its political writings with the market for the Groby and Chambers Photographs themselves.  That Hayride and Dermansky have opposing political views has no relevancy as to the market for her images.  While it may be true that only persons of a certain political stripe consume Hayride's content, it does not follow that none of those same individuals form the market for photographs of Groby and Chambers.  Indeed, Hayride need only look to itself to see that the potential market for those works is not limited by particular social or political beliefs.  Hayride and Dermansky may inhabit "different spheres," but that has no

---

[173] While the size of the market for these two particular images may not be large, fair use does not depend on the popularity of a specific work.  A "Dermansky" is not less protected by the Copyright Act than a "Warhol."  *Cf. Roy Exp. Co. Establishment of Vaduz, Liechtenstein, Black Inc., A.G. v. Columbia Broad. Sys., Inc.*, 503 F. Supp. 1137, 1144 (S.D.N.Y. 1980) ("Under CBS' view, the more successful an artist is, the less he can protect or demand payment for the use of his work. Yet the copyright law bestows a monopoly right on the copyright owner to encourage artistic creativity, and would be undermined by CBS' bootstrapping argument."), *aff'd sub nom. Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095 (2d Cir. 1982).
[174] R. Doc. 34-1 at pp. 29–30.
[175] R. Doc. 30-1 at pp. 17–18.

effect on the licensing market for the Chambers and Groby Photographs, the relevant market here.[176]

Consistent with the Court's finding that Hayride's uses of the Groby and Chambers Photographs were commercial in nature and not transformative, the Court finds that Hayride's uses are market substitutes for Dermansky's original works. Any person looking for a photograph of either Groby or Chambers can either pay Dermansky a licensing fee to use her works or they can copy the same work directly from Hayride's website. This is a clear-cut example of a market substitute, regardless of Hayride's intentions. Moreover, the fact that Hayride is unaware of anyone asking Hayride to license the Photographs or of anyone copying the Photographs from Hayride's website[177] does not help Hayride's case because "widespread use" of the images "in the same infringing fashion 'would result in a substantially adverse impact on the potential market' for the original work."[178] If anyone "could use such images for free, there would be little or no reason to pay for [them]."[179] Hayride has failed to meet its burden in proving a lack of potential market harm by its duplicative,

---

[176] Likewise, that Warhol and Goldsmith may appeal to different markets, the Second Circuit explained, did not change the fact that both "sought to license (and indeed have successfully licensed) their respective depictions of Prince to popular print magazines to accompany articles about him." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 49 (2d Cir. 2021). This direct competition in the licensing market led the court in that case to conclude that the fourth factor weighed against a finding of fair use given the substantial threat of harm to Goldsmith's licensing prospects. *Id.*

[177] Hayride provides no explanation as to how it could possibly know whether or not any site visitor has copied either the Groby or Chambers Photographs from its blog.

[178] *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 324 (5th Cir. 2022) (quoting *Campbell*, 510 U.S. at 590).

[179] *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 355 (S.D.N.Y. 2017).

non-transformative commercial use of Dermansky's work.  This factor thus weighs against a finding of fair use.

### 5.  Weighing the Factors

All four statutory fair use factors weigh in favor of Dermansky and against a finding of fair use by Hayride.  Although these factors are not exclusive, Hayride has not identified any other relevant consideration that the Court should take into account.  Accordingly, the Court finds that Hayride's fair use defense fails as a matter of law and denies Hayride's Motion for Summary Judgment and grants Dermansky's Cross-Motion for Summary Judgment.

### B. § 1202 CMI Stripping Claims

Hayrides moves for summary judgment on Dermansky's 17 U.S.C. § 1202 CMI-stripping claims, arguing that Dermansky has failed to carry her burden of proof on those claims.[180]  In response, Dermansky urges the Court to deny Hayride's motion under Fed. R. Civ. P. 56(d) as premature due to ongoing discovery.[181]  Dermansky contends that there are numerous unresolved factual issues relevant to her § 1202 claims sufficient to warrant the denial of Hayride's motion at this time.[182]

The Court finds it inappropriate at this stage to enter summary judgment on Dermansky's § 1202 claims due to the myriad factual disputes between the parties as to where Hayride first found the Groby and Chambers Photographs and whether those Photographs contained any CMI data regarding Dermansky's copyright.  By

---

[180] *See* R. Doc. 30-1 at pp. 19–21.
[181] *See* R. Doc. 34-1 at pp. 32–35.
[182] *See id.*

way of one significant example, Dermansky argues that because she only authorized or licensed the use of the Groby Photograph for the DeSmog blog and Truthout publication, both of which contained her copyright information, Hayride therefore *must* have found the Groby image on the website for one of those publications and, accordingly, removed her copyright information when Hayride later published the images.[183]  Hayride disputes this, contending that it found the Groby Photograph on Groby's own personal Facebook profile without any copyright notice.[184]  In response, Dermansky argues that Groby's official Facebook page was not created until after Hayride first published the Groby Photograph and that there is no evidence that the Photograph was ever posted by Groby on Facebook.[185]

This dispute is both genuine and material because where Hayride found the Groby Photograph and in what condition, *i.e.*, whether a copyright notice accompanied the Photograph, goes directly to the heart of the § 1202 claims.  A similar dispute exists over the Chambers Photograph, including whether the image contained CMI-containing metadata.[186]  The Court further points to Hayride's Supplemental Memorandum to support its denial of Hayride's motion for summary judgment on this claim.[187]  Hayride argues that the email between Dermansky and

---

[183] *See* R. Doc. 34-3, *Dermansky Decl.*, at ¶¶ 7–9; R. Doc. 34-1 at pp. 9–10.

[184] *See* R. Doc. 30-1 at p. 20; R. Doc. 54 at pp. 1–3; R. Doc. 30-2, *McKay Decl.*, at ¶ 7.

[185] *See* R. Doc. 34-1 at p. 10; R. Doc. 34-3, *Dermansky Decl.*, at ¶ 8; R. Doc. 34-8.

[186] In brief, Hayride contains that it found the Chambers Photograph on the "Tiger Droppings" board without any copyright notice.  *See* R. Doc. 30-2, *McKay Decl.*, at ¶ 10.  Dermansky argues that this image contained CMI metadata which Hayride either saw or should have noticed.  *See* R. Doc. 34-3, *Dermansky Decl.*, at ¶ 16.  Hayride denies having any knowledge of this CMI information.  *See* R. Doc. 30-2, *McKay Decl.*, at ¶ 10.  This is a genuine material dispute of fact that is inappropriate for a court to resolve on summary judgment.

[187] R. Doc. 56.

her publisher support Hayride's claims that some of Dermansky's photographs were published on social media without watermarks.  The Court does not find the email exchange to support Hayride's motion, at least not at this juncture.  Instead, the email only references one email exchange between Dermansky and her publisher in which Dermansky is reminding her publisher to include only watermarked photographs on social media.  Further, Hayride's reliance on that email exchange ignores that Hayride used the Groby Photograph twice in 2015 and used the Chambers Photograph in 2017, 2018, and 2019.  Moreover, to resolve this dispute in either direction would require the Court to consider the credibility of the parties which this Court cannot and will not do at the summary judgment stage.[188]  Further, the Court notes that "summary judgment is rarely proper where, as here, an issue of intent is involved."[189]  Accordingly, because of the presence of genuine issues of material fact, the Court will not enter summary judgment on the § 1202 claims at this time and denies Hayride's Motion.

## C. Innocent Infringer Defense

Hayride moves the Court to declare Hayride an "innocent infringer" in the event that the Court denies summary judgment on Hayride's fair use defense.[190]  The "innocent infringer" defense gives a court discretion to reduce the minimum statutory damages from $750 to $200 per infringement if the court finds that the infringer "was

---

[188] *See Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) ("Doing so is tantamount to making a credibility determination, and—at this summary judgment stage—a court 'may make no credibility determinations.'" (quoting *Chambers v. Sears Roebuck & Co.*, 428 Fed. Appx. 400, 407–08 (5th Cir. 2011))).
[189] *Matter of Lasala*, 542 F. Supp. 3d 439, 445 (E.D. La. 2021) (Vitter, J.) (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996)).
[190] R. Doc. 30-1 at pp. 21–22.

not aware and had no reason to believe that his or her acts constituted an infringement of copyright."[191]

The Court finds it premature at this stage to declare Hayride to be an "innocent infringer."  Before the innocent infringer defense can be invoked, the plaintiff must first voluntarily elect to recover statutory damages in lieu of actual damages and profits.[192]  Only then can a defendant raise the "innocent infringer" defense.  Because Dermansky has not yet elected to pursue statutory damages, the Court cannot yet rule on the merits of Hayride's "innocent infringer" defense.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Plaintiff's Motion for Summary Judgment[193] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Cross-Motion for Partial Summary Judgment and Other Relief Under Rule 56[194] is **GRANTED.**

New Orleans, Louisiana, September 20, 2023.

**WENDY B. VITTER**
**United States District Judge**

---

[191] 17 U.S.C. § 504(c)(2).
[192] *Id.*
[193] R. Doc. 30.
[194] R. Doc. 34.